### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**JODEE ORTEGO**  \* CASE NO. 13-836

**VERSUS**  \* JUDGE CARL J. BARBIER
 \* MAG. JUDGE J.C. WILKINSON

**DOTD AND CONNIE STANDIGE**  \* SECTION "J"(2)

## PLAINTIFF'S OPPOSITION MEMORANDUM TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

By Attorney:

BELL LAW FIRM, LLC

*/s/ Paul F. Bell*

Paul F. Bell, La. Bar Roll No. 30391

4949 Tulane Drive

Baton Rouge, LA  70808

225-284-3235; 888-812-7933 fax;  bz9@cox.net

*Attorney for Plaintiff, Jodee Ortego*

# TABLE OF CONTENTS

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   BACKGROUND FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.   PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV.   LAW AND ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

   A.  Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

   B.  Material Facts to Which There Exist Genuine Disputes Requiring Trial . . . .   10

      1.  ADA disability discrimination claim:  Material facts in genuine dispute
      where DOTD refused Ortego's request for accommodation .. . . . . . . . . . . 10

      2.  ADA retaliation claim:  Material facts in genuine dispute where
      Defendants stated in DOTD Tate's retaliatory lawsuit and DOTD
      termination notices that Ortego created hostile work environment when
      engaging in protected activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      3.  ADA harassment claim:  Material facts in genuine dispute when DOTD
      held Ortego up to months of ridicule and years of harassment.. . . . . . . . . 26

      4.  1st Amendment speech claim:  Material facts in genuine dispute where
      DOTD's Connie Standige terminated Ortego for filing police complaints of
      road rage/stalking against DOTD's Tate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      5.  State  Law claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

V.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

VI.   EXHIBITS

To meet upload requirements, exhibits 1 to 5 and 7 to end were placed in one file.
Exhibit 6 is many megabytes and was uploaded separately.  The exhibits are

exhibits 1 to 12, 13 is intentionally blank, 14 to 25, and, from Defendants memorandum, copied for convenience sake are included exhibits L, N, R, X, BB, EE, FF, and HH.

## TABLE OF AUTHORITIES

**CASES:**

*Beattie v. Madison County School District,* 254 F.3d 595 (5th Cir.2001). . . . . . . . . . . . . . . . . . 29

*Burch v. Coca-Cola Co.,* 119 F.3d 305 (5th Cir.1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Burlington N. and Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006). . . . . . . . . . . . . . . . . . . . . . 19

*Crawford v. Metro. Gov't. of Nashville & Davidson Cnty,* 555 U.S. 271 (2009). . . . . . . . . . . 18

*Feist v. State of Louisiana, Dep't. of Justice,* 730 F.3d 450 (5th Cir. 2013). . . . . . . . . . . . . . 11, 16

*Flowers v. S. Reg'l Physician Servs. Inc.,* 247 F.3d 229 (5th Cir.2001). . . . . . . . . . . . . . . . . . . 27

*Jackson v DOTD,* 09-69 (EDLA 1/21/10) 2010WL324389. . . . . . . . . . . . . . . . . . . . . . 3, 8, 16, 19

*Loulseged v. Akzo Nobel, Inc.,* 178 F.3d 731 (5th Cir.1999). . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Mayes v. Galveston County Juvenile Detention Center,* 2002 WL 432652 (5th Cir.2002). . . . 29

*McCoy v. City of Shreveport,* 492 F.3d 551 (5th Cir.2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Stewart v. RSC Equip. Rental, Inc.,* 485 F. App'x 649 (5th Cir. 2012). . . . . . . . . . . . . . . . . . . . 18

*Tate v DOTD,* 11-1212 (EDLA 5/4/12) 2012WL1580772. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Taylor v. Principal Financial Group, Inc.,* 93 F.3d 155 (5th Cir.), cert. denied, 519 U.S. 1029 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 15

**OTHER SOURCES**

*Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the ADA,* EEOC. #915.002; 10/17/2002  http://www.eeoc.gov/policy/docs/accommodation.html . 65

**STATUTES:**

La. Const. Art. I, § 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

29 C.F.R. § 1630.9, App. (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

42 U.S.C. Sec. 12112(b)(5)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. Sec. 2000e-3(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

## I.  INTRODUCTION

This case rests on an issue of fact that is in dispute.  Were Plaintiff Ortego's complaints filed against DOTD employee Shelia Tate between 2008 and 2011 legitimate?  If they were legitimate, employer DOTD's and Connie Standige's reasons for firing her were unlawful.   If Ortego's charges were found false, however, Defendants's claim that the charges caused a hostile work environment would be true and they would have had reason to terminate Ortego.  These question of the falseness or truth of Ortego's claims against DOTD's Tate, and thereby the claims in this case, are in dispute.  As explained below, Defendants Motion for Summary Judgment should be denied as there are genuine disputes of material facts present.

## II.  BACKGROUND FACTS

Ortego started employment at DOTD in July, 2005 at its District 62 offices in Hammond, La as a stockroom clerk.[1]  Shortly after, in July, 2006, doctors diagnosed her with epilepsy.[2]  Epilepsy is a disorder of the nervous system that can cause people to suddenly become unconscious and to have violent, uncontrolled movements of the body.[3] In its active state, epilepsy substantially limits major life activities of consciousness, standing, and walking.[4]  Ortego suffered several mild seizures while

---

[1]  Ex. 5 at 24.

[2]  Ex. 5 at 30.

[3]  Merriam Webster dictionary; http://www.merriam-webster.com/dictionary/epilepsy

[4]  Ex. 5 at 58-60.

working at DOTD.[5]

Ortego's DOTD supervisors were, in order of lower to higher rank, Karen Dunnington, Rhonda Rylatt, Sherrie McKinney, and Shelia Tate (hereinafter, Dunnington, Rylatt, McKinney, and Tate).[6]  Shortly after suffering a seizure at work, DOTD ended Ortego's work duties that involved driving a vehicle or climbing ladders.[7]

Ortego's first requested an accommodation for her disability from DOTD upon suggestion of her supervisors Dunnington and McKinney.[8]  Ortego had taken so much leave for doctors appointments required for her epilepsy that her supervisors worried that she risked running out of leave and losing her job.[9]  Her second level supervisor, Sherry McKinney, suggested on October 13, 2008 that she ask DOTD for an accommodation to work 10-hour days and a four-day work week.  This would give her a day each week to visit doctors.  Ortego agreed and forwarded her request to her supervisors on October 14, 2008.[10]  On October 15, 2008, McKinney presented the accommodation request for a work-schedule change to Rylatt who told McKinney she would also need Tate's approval.[11]  McKinney asked Tate for approval but she denied it

---

[5] Id.

[6] Ex. 5 at 26.

[7] Ex. 5 at 30.

[8] Ex. 5 at 82–87; Ex. 11; Ex. 17.

[9] Id.

[10] Ex. 5 at 94.

[11] Ex. 11.

telling her that she no longer wanted to accommodate "FMLA people" like Ortego.[12]

On October 23, 2008, Tate asked to speak with Ortego and they discussed her accommodation request.[13]  When Ortego told Tate her request was triggered by her three supervisors' suggestion, Tate became visibly angry.[14]  Tate figured Ortego's supervisors were using Ortego to set up Tate to be disciplined.  Tate explained to Ortego that she had already had denied an accommodation request from another disabled employee, Judy Schilling, and so denied Ortego's request, too.[15]   Tate worried that she would be accused of discrimination if she gave her an accommodation.  She asked Ortego what would it look like if she denied a request for a work-schedule change from a black woman, Vanessa Jackson, but gave it to a disabled white person?[16] Tate had had problems with Ms. Jackson.  Vanessa Jackson later sued DOTD alleging Tate had provided FMLA leave to White but not Black employees.[17]

Tate told Ortego that she would fix the problem of employees asking for ten-hour days, she would eliminate ten-hour work days.[18] Tate yelled that the tens would be going and would be going very soon.[19]  That afternoon, Tate announced that

---

[12]  Id.  *Id.*

[13]  Ex. 5 at 88-93.

[14]  Id.

[15]  Id.

[16]  Id.

[17]  *Jackson v DOTD*, 09-69 (1/21/10 EDLA) 2010WL324389.

[18]  Ex. 5 at 88-93.

[19]  Ex. 5 at 89-91.

ten-hour work days would end.[20]  All employees would work five days a week with different starting times each week.[21]

When Ortego's fellow employees discovered that their work schedules would change in the next month, they were furious at Ortego.[22]  They blamed her and asked her what she had done to Shelia Tate and what had happened when she had met with Tate to have caused the work-schedule change.[23]

On October 29, 2008, Ortego, Tate, McKinney, Dunnington, Sharon Wells, and Rylatt met to talk about the rotating-work schedules.[24]  Ortego asked in general terms about a modified work schedule for disabled persons.  Tate replied, "Like who?"  Ortego replied, "Shelia, me."  Then Shelia said in front of the group, "What disability?"  Ortego said that she had epilepsy seizure disorder and required medicine that had to be taken at set times and before driving.  Tate proceeded to tell Ortego when she should take her medicine.  Ortego objected to her statement and Tate offered Ortego names of attorneys.[25]

About this time, Tate went out of her way to make Ortego's work environment difficult.  Ortego was the only one in her unit assigned to operate the switchboard each

---

[20]  *Id.*

[21]  *Id.*

[22]  Ex. 5 at 93, 95, 126.

[23]  Ex. 5 at 93.

[24]  Ex. 5 at 96–102.

[25]  *Id.*; Ex. N at p. 2.

week.[26]  Her supervisors explained that this was to make up for the slack she had been given because of her epilepsy.[27]  Tate gave her extra duties with deadlines impossible to meet.[28]  Tate helped ensure Ortego's work load was increased while not similarly increasing others' work load.[29]

When Tate announced the new work schedules with rotating starting times, Ortego asked whether she could keep the non-rotating work schedule she had.  Ortego feared that with different start times each week, it would trigger seizures due to the alteration in routine.  Tate refused this accommodation request.[30]  Ortego asked HR official Candy Cardwell to intercede on her behalf.[31]  Cardwell pressured Tate to allow Ortego to keep her old work schedule except that she would start later than she had before.  Tate agreed on November 7, 2008.[32]

In addition to the work-schedule change, Tate concurrently revised break policy. Employees were instructed that they had to take breaks at specific times and only during those periods.  If employees were taken away from their break due to work duties, the employee would lose the break.[33]

---

[26]  Ex. 5 at 25.

[27]  Ex. 5 at 30.

[28]  Ex. 5 at 145, 147.

[29]  Ex. 11.

[30]  Ex. 5 at 96–102.

[31]  Ex. O.

[32]  Ex. R.

[33]  Ex. L.

DOTD held a meeting on February 5, 2009 to discuss work conditions at District 62. In response to many complaints, DOTD agreed to end Tate's new work and break schedules and would return to the old schedule in three months.[34] Tate contends in her lawsuit that DOTD's reversal of her schedule change was because of DOTD's racial animus against her.[35]

On March 2, 2009, Ortego filed a charge with the Louisiana Commission on Human Rights (later, EEOC charge) against DOTD alleging ADA violations by Tate.[36]

On May 7, 2009, Plaintiff  Ortego filed a grievance at DOTD alleging Tate had harassed (or retaliated against) her when Tate  implemented her new work and break schedules.  Ex. 20. Although DOTD did nothing against Tate regarding this grievance,[37] Tate objected to Ortego's grievance and, later in a lawsuit against Ortego and DOTD claimed this was part of DOTD's failure to protect Tate.[38]

Tate investigated supposed computer misuse by Ortego in March, 2010.  She concluded that Ortego violated DOTD policies when she visited non-business sites although a virus was likely responsible for the visits.[39]  Although many workers visited these sites, Tate penalized only Ortego and assigned her more work.  Ortego's

---

[34] Ex.T; Ex. U.

[35] Ex. 7.

[36] Ex. 14

[37] Ex. 1.

[38] Ex. 7.

[39] Ex. FF; Ex. 16.

supervisor Sharon McKinney emailed her supervisor, Ronda Rylatt, telling her Shelia Tate's treatment of Ortego unfair.[40]  McKinney argued against penalizing Ortego with more duties and found the computer-surveillance improper. She stated that accusing Ortego of being on the non-business sites for hours as contended were impossible given the amount of work she knows Ortego does.   She wrote, "It is a known fact that Shelia hates Jodee and is singling her out to bully and bash."[41]  DOTD criticized Ortego when they terminated her for complaining of Tate's assigning her more duties because of the investigation.[42]

On about April 29, 2010, Paula Berwick; of District 62 Human Resources, told Ortego that Shelia Tate pointed Ortego out to Berwick and, said, "You see that girl.   I can't stand her!  I hate that girl!"[43]

On May 17, 2010, Plaintiff and five of the about eighteen employees under Tate's supervision filed a DOTD complaint against Shelia Tate alleging harassment.[44]  Plaintiff mentioned her problems regarding Tate's ADA violations of refusal to accommodate and retaliation.  DOTD stated it had provided an accommodation to Plaintiff and ignored that Tate had refused Ortego's first two requests for accommodation and Tate's

---

[40]  Ex. 11 in its ex. 2.

[41]  *Id.*

[42]  Ex. FF.

[43]  Ex. 6 at 1522.

[44]  Ex. 1.

subsequent retaliation.[45]

On September 27, 2010, Ortego left work in her car and went to a nearby store whereupon Tate followed very closely with her car nearly touching Ortego's car.[46] Ortego felt threatened by Tate's driving.  After later consulting with her husband and supervisor McKinney, she filed a police complaint against Tate.[47]

Ms. Ortego met with District 62 Administrator, Ms. Standige, and second line supervisor, Sherry McKinney, the day after Tate's stalking to talk about the incident. While talking to them, Ortego suffered a seizure.[48]

Tate sued Ortego and DOTD officials on May 23, 2011 alleging that DOTD and Ortego violated discrimination laws when Ortego filed her EEOC charge and DOTD charges against her and DOTD did not reprimand Ortego in return.[49]  Despite four amended complaints, the court dismissed the case on Motion to Dismiss.[50]

On July 29, 2011, Ortego again found Tate tailgating her very closely as she left work.  Ortego filed a police report during her lunch break against Tate for stalking her with her vehicle.[51]  Ortego also went to the District 62 Administrator, Connie Standige,

---

[45] Ex. BB.

[46] Ex. 15; Ex. 18; Ex. 11 at para. 2 and its ex. 2.

[47] Ex. 18.

[48] *Id.*

[49] Ex. 7, para. 41.

[50] *Jackson v DOTD*, 09-69 (1/21/10 EDLA) 2010WL324389.

[51] Ex. 15.

and voiced her concern for her safety in the workplace.  Standige confronted Ortego

claiming she had lied.[52]   Ortego told them that she felt unsafe around Tate and that she

thought Tate was a violent person.[53]   Ortego told them Tate was that way because

Ortego had filed an EEOC complaint against her.[54]   Ortego told them of Paula

Berwick's conversation with Tate where Tate told her that she hated Ortego.[55]   Ortego

explained that Tate tried to corner her in the hallways as if she would harm her.[56]

On September 9, 2011, DOTD sent Ortego a pre-termination letter alleging that

over the past several years, Ortego had filed supposed false complaints and false

charges of harassment against Ms. Shelia Tate.[57]   DOTD concluded that Ortego's

allegedly false charges and complaints had created a hostile work environment.[58]

DOTD stated that the alleged false charges included her EEOC, Title VII ADA charges,

and the stalking charges.[59]   DOTD, in effect, was terminating Ortego because Ortego

relayed to DOTD her evidence for Tate's retaliation and because Ortego had pursued

her rights under ADA to file complaints against DOTD and Ortego.  On February 20,

---

[52]  Ex. FF.

[53]  Ex. 19.

[54]  *Id.*

[55]  *Id.*  Ex. 6 at 1522.

[56]  Ex. 19.

[57]  Ex. FF.

[58]  *Id.*

[59]  *Id.*

2012, DOTD reiterated those reasons and terminated Ortego's employment.[60]

## III.  PROCEDURAL BACKGROUND

The Defendants presented the procedural background in their memorandum and no additional comment is necessary.

## IV.  LAW AND ARGUMENT

Below and in the Facts pleading attached, Plaintiff Ortego establishes why the Defendants' Motion for Summary Judgment should be denied as there exist genuine disputes of material fact as to Plaintiff's claims under the ADA and the First Amendment.  Her claims are the following:  i) disability discrimination as shown by Defendants's refusal to accommodate;  ii) ADA and state law equivalent retaliation claim; iii) ADA and state law equivalent harassment claim; and iv) Constitutional speech claims filed under the 1st Amendment via 42 U.S.C. §1983 and Louisiana Constitution, La. Const. Art. I, § 7.

## A.  Standard of Review

As the Court is familiar with the summary judgment standard; it will not be reviewed here.

## B.  MATERIAL FACTS AS TO WHICH THERE EXISTS A GENUINE DISPUTES REQUIRING TRIAL

### 1.  ADA disability discrimination claim:  Material facts in genuine dispute

---

[60]  Ex. HH.

**where DOTD refused Ortego's request for accommodation**

Contrary to Defendants assertions, Plaintiff requested an ADA accommodation in October, 2008.  Defendants denied that ADA request and, therefore, discriminated against Plaintiff under the ADA.[61]

*Prima Facie Case—Failure to Accommodate*

Under the ADA, disability discrimination can occur where the employer fails to provide reasonable accommodations to a qualified individual with a disability unless the employer can show that the accommodation would cause an undue hardship to the employer.[62]  The statutory elements of an ADA discrimination claim based on failure to accommodate are the following:  (i) the plaintiff is a qualified individual with a disability; (ii) the disability and its consequential limitations were known by the covered employer; and (iii) the employer failed to make reasonable accommodations for such known limitations.[63]

*DOTD's Refusal to Accommodate*

Contrary to Defendants' arguments, Plaintiff fulfilled the requirements for requesting an ADA accommodation on October 14, 2008 (Defendants' mistakenly stated Ortego filed the first work-schedule change on October 20th when it was really the

---

[61] *Feist v. State of Louisiana, Dep't. of Justice*, 730 F.3d 450, 452 (5th Cir. 2013) citing 42 U.S.C. Sec. 12112(b)(5)(A).

[62] *Id.*

[63] *Id.*

14th).[64]  Defendants argue that the request could not have been an accommodation

request because it lacked a doctor's appointment and the DOTD form for filing ADA

accommodations.  No formal application need be made to request an ADA

accommodation, however.[65]

   The requirements for an employee to request an accommodation are that she tell

her employer that she needs an adjustment or change at work for a reason related to a

medical condition.[66]  The employee may use plain English and need not mention the

ADA or use the phrase reasonable accommodation.   EEOC guidelines state that a

suitable request may be as simple as "I'm having trouble getting to work at my

scheduled starting time because of medical treatments I'm undergoing."[67]

   Unless initiated voluntarily by the employer, the initial burden to request an

accommodation rests on the employee.[68]   The Fifth Circuit recognizes that "the

responsibility for fashioning a reasonable accommodation is shared between the

employee and the employer."[69]

   Here, Ortego's supervisors McKinney and Dunnington realized that Ortego had

---

[64]  Ex. 5 at 94.

[65]  *Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the ADA.*  EEOC. No. 915.002; 10/17/2002  http://www.eeoc.gov/policy/docs/accommodation.html

[66]  *Id.*

[67]  *Id.*

[68]  *Burch v. Coca-Cola Co.*, 119 F.3d 305, 320 (5th Cir.1997); *Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 164–65 (5th Cir.), cert. denied, 519 U.S. 1029, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996).

[69]  *Loulseged v. Akzo Nobel, Inc.*, 178 F.3d 731, 736 (5th Cir.1999) (quoting *Principal Fin. Group*, 93 F.3d at 165).

been taking so much leave for doctor appointments because of her epilepsy that she risked running out of leave and termination.[70]  McKinney and Dunnington spoke with Ortego about the accommodation.[71]  McKinney spoke with her supervisor, Rylatt, who had no objection to providing it.[72]  McKinney went back to Ortego and suggested she request the accommodation of taking ten-hour work days and a four-day work week. Ortego spoke with her family and asked McKinney for the accommodation on October 14, 2008.[73]  At that point, Ortego had spoken or worked with her three direct supervisors and her family about the accommodation.  This would constitute an interactive process under the ADA.  At that point, her ADA obligations for requesting the accommodation and engaging in an interactive discussion had been met.[74]  It was then DOTD's decision whether to approve or deny it.[75]  McKinney gave the schedule change to Rylatt who said she would also need Ortego's fourth-level supervisor's, Tate, permission.[76]

On October 15, 2008, supervisor McKinney asked Tate to approve the accommodation.  Tate refused the request.[77]  She knew the leave was medical related as

---

[70]  Ex. 11; Ex. 17.

[71]  *Id.*

[72]  Ex. 11.

[73]  *Id.*

[74]  *Taylor*, 93 F.3d at 165.

[75]  Ex. 11; Ex. 17.

[76]  Ex. 11.

[77]  *Id.*

she explained to McKinney that her refusal was based on the fact that she was tired of accommodating "FMLA people" and that there were too many people on FMLA.[78] Although this was not an FMLA request and FMLA requests do not include work-schedule changes, it appears Tate lumped FMLA and ADA requests together and was refusing both types of requests.  In any event, her comments show that she was aware that the request was due to a medical-related request of Ortego's.[79]

Tate herself explained that she had refused the request because she had thought that DOTD officials David [Tippett] and Marliss had told her to refuse accommodation requests.[80]  When Ortego spoke with Tate about how she had intended to use the free week-day to go to doctors appointments, Tate told her that a lot of people preferred ten-days.[81]  She voiced no surprise at the mention of any need by Ortego for visiting doctors.[82]  But when Ortego told Tate that Ortego's immediate supervisors had initiated the request, Ortego became visibly angry loudly saying "The Tens will be going".[83] There was no discussion of how to handle leave and Ortego's doctor appointments. Her solution was to end all ten-hour work days whether disabled or not.

*DOTD's Refusal to Enter into Interactive Discussion*

---

[78]  *Id.*

[79]  Ex. 11; Ex. 17.

[80]  Ex. N.

[81]  Ex. 5 at 88-93;  Ex. 6 at 1479-1483.

[82]  *Id.*

[83]  *Id.*

Since DOTD did not consider Ortego's October request as one for an accommodation, it did not address in their memorandum whether DOTD engaged in an interactive discussion on that request.  It is defined as a "flexible, interactive process that involves both the employer and the qualified individual with a disability."[84] Ortego and her three direct supervisors entered into an interactive discussion on how best to accommodate her chance at losing her job because of the medical appointments necessary to treat her epilepsy.[85] There is no requirement the employee engage in more than an interactive discussion and request an accommodation from her employer.[86]  In any event, Tate told McKinney that she was tired of accommodating FMLA people and that there were too many on FMLA.[87] This explanation allows no option for interactive discussion.

Six days after McKinney asked Tate for the accommodation, Tate asked to speak with Ortego.  Tate told her she refused the accommodation because it would be perceived as discrimination against a Black woman, Vanessa Jackson.[88]  This explanation did not allow for any interactive discussion and was not valid business reason for refusing the accommodation.  Tate's fear had some reason to it, however, as

---

[84]  *Taylor*, 93 F.3d at 165 citing 29 C.F.R. § 1630.9, App. (1995).

[85]  Ex. 11.

[86]  *Taylor*, 93 F.3d at 165.

[87]  Ex. 11.

[88]  Ex. 5 at 88-93.

Vanessa Jackson sued DOTD alleging that Tate had favored White workers over Black in granting FMLA leave time.[89]

### 2. ADA retaliation claim:  Material facts in genuine dispute where Defendants stated in DOTD Tate's retaliatory lawsuit and DOTD termination notices that Ortego created hostile work environment when engaging in protected activity

In discussing the ADA retaliation claim in its memorandum, DOTD erred in claiming that one can only prove retaliation if there is closeness in time between the protected act and the retaliation.  Actually, direct or circumstantial evidence can be used.[90]  DOTD, too, erred in failing to recognize Ortego's protected act of requesting an accommodation in October, 2008 as discussed above.

*Prima Facie case*

Plaintiff proves a prima facie case of retaliation under the ADA or Title VII by showing the following:  (i) she participated in an activity protected under the statute; (ii) her employer took an adverse employment action against her; and (iii) a causal connection exists between the protected activity and the adverse action.[91]

The employer may rebut the prima facie case by stating a legitimate, non-retaliatory reason for its decision.[92]  The employee may then provide evidence to

---

[89]  *Jackson v DOTD*, 09-69 (1/21/10 EDLA) 2010WL324389.

[90]  *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir.2007).

[91]  *Feist*, 730 F.3d at 454 (citing *McCoy v. City of Shreveport*, 492 F.3d 551, 556–57 (5th Cir.2007).

[92]  *Id.*

show the reasons provided are a pretext for retaliation.[93]

*Protected Activity of October, 2008*

DOTD failed to evaluate or include all protected activities engaged by Ortego in its Motion for Summary Judgment.  The complete list are as follows:  (i) requesting an accommodation on October 15, 2008; (ii) filing an EEOC charge regarding ADA violations on March 2, 2009;  (iii) filing a DOTD complaint alleging ADA violations on May 7, 2009;  and (iv) filing a DOTD complaint along with five other employees on May 17, 2010 alleging harassment and retaliation.[94]

DOTD recognized only one request for accommodation as a protected activity because it argued that Ortego's October request for one failed as an accommodation request.   As explained above, Ortego met the requirements for notice and interactive discussion for this request and, therefore, this request would be an additional protected activity of Ortego's.

DOTD did not list two in-house DOTD complaints alleging ADA violations and Title VII harassment and retaliation as protected activities.  Protected activities can include more than EEOC and accommodation requests that come under the participation clause for retaliation claims.[95]  Under the opposition clause, it is illegal "for

---

[93] *Id.*

[94] Exhibits 14, 20, 22, and 1 for the three charges.

[95] 42 U.S.C. Sec. 2000e-3(a).

an employer to discriminate against any employee[ ] ... because he has opposed any practice made [ ] unlawful."[96]  Because the word "oppose" in Title VII is undefined, it is proper to use a dictionary definition, such as "to resist or antagonize; to contend against; to confront; resist; [or] withstand."[97]   The 5th Circuit has found that protected activities included words employee spoke to his supervisor complaining that because he was Black he reprimanded him in front of customers but did not do so for White co-workers.[98]

The two charges Ortego made in 2009 alleged ADA violations of failure to accommodate and retaliation for requesting the accommodation.[99]  Ortego's 2010 complaint was part of a complaint by six employees that included race and disability claims.[100]   These complaints, therefore, opposed the illegal activity involving discrimination and retaliation under the ADA and would be considered protected activities.

*Adverse employment actions of DOTD*

Unlike adverse actions for discrimination claims that generally require some wage loss, retaliation claims allow any type of adverse action provided the actions are

---

[96]  *Stewart v. RSC Equip. Rental, Inc.,* 485 F. App'x 649, 652 (5th Cir. 2012) citing 42 U.S.C. § 2000e–3(a); *Crawford v. Metro. Gov't. of Nashville & Davidson Cnty., Tenn.,* 555 U.S. 271, 276 (2009).

[97]  *Id.* at 653.

[98]  *Id. at* 652-3.

[99]  Ex. 14; Ex. 20.

[100]  Ex. 1; Ex. 22.

those that "a reasonable employee would have found . . . [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination".[101]

DOTD listed in its memorandum only some of the retaliatory acts against Ortego.  DOTD listed Ortego's suspension and termination, and day-to-day harassment.  DOTD failed to include the hostile work environment against Ortego that occurred as a result of Tate's schedule change, and Tate's harassment of Ortego by Tate's filing a frivolous federal lawsuit against Ortego for her having filed EEOC and DOTD in-house claims regarding ADA violations against Tate.

*Hostile work environment resulting from Tate making Ortego share blame for Tate's schedule change:*  After Tate denied Ortego's request for ten-hour work days, Tate spoke with Ortego about it.[102]  When Ortego told Tate that her three supervisors actually were the ones who suggested the accommodation to her, Tate became angry.  She said in a loud voice, "The Tens will be going".[103]  She told Ortego that her supervisors were trying to set her and Ortego up.[104]  Tate worried that if she helped Ortego, she would be accused of discrimination when she denied help to a Black woman, Vanessa Jackson.[105]

---

[101]  *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

[102]  Ex. 5 at 88–93; Ex. 6 at 1479–83.

[103]  *Id.*

[104]  *Id.*

[105]  *Id.*

She said that many employees preferred ten hour work days.  Tate, angry, told Ortego

that the employees would no longer work ten-hour work days.  Hours later, Tate

emailed the business office and announced ten-hour work days would end and

employees would instead work five-day work weeks that started at different times each

week.[106]

This schedule change surprised the employees.  Supervisor McKinney had been

unaware of any plan to end ten-hour work days.[107]  McKinney had access to ten-hour

work days for 19 years at DOTD and had never been denied using them before.[108]

Workers were very upset and blamed Ortego in part.[109]  DOTD interviewed six

complainants against Tate who all stated that it was understood that the schedule

change came directly as a result of the meeting between Ortego and Tate.[110]  Employees

knew that Tate had a temper and found it likely something in the meeting caused it.[111]

Some employees would avoid speaking to Ortego and some blamed her openly for the

schedule change.[112]  Ortego had one of the lowest ranked positions and this made it

easier for others to complain about her.

---

[106]  *Id.*

[107]  Ex. 11.

[108]  *Id.*

[109]  Ex. 5 at 95.

[110]  Ex. 1.

[111]  Ex. 11.

[112]  Ex. 5 at 95; Ex. 6 at 1484.

After 3 months of the new schedule, DOTD conducted an office-wide meeting and solicited comments.[113]  Some voiced concern of Tate's abusive nature and the the hostile work environment.[114]  DOTD, in response to complaints, agreed to end the new work schedule.  It took another 2.5 months before the old schedule was returned.[115]  The schedule change resulted in much stress and much criticism of Ortego for having helped cause it.[116]

*DOTD's Tate sued Ortego in a retaliatory act:*  Tate sued in federal court Ortego, top DOTD officials, DOTD investigators, and the HR representative at District 62, Ronda Rylatt.[117]  Tate accused Ortego of filing false complaints against her and DOTD of not disciplining her for those filings.[118]  Those included the EEOC, DOTD charges in 2009 and 2010, and the police complaints.[119]  Tate claimed this lack of disciplining evidence of discrimination against her because of her race, African-American.[120]  Despite multiple amendments, the case was dismissed upon Motion to Dismiss.[121]  Tate's charges against Ortego for filing false charges were baseless and were designed to retaliate against

---

[113]  Ex. T.

[114]  Ex. 20; Ex. 24.

[115]  Ex. 1.

[116]  Ex. 20.

[117]  Ex. 7.

[118]  *Id.* at para. 41.

[119]  *Id.*

[120]  *Id.*

[121]  *Tate v DOTD*, 11-1212 (5/4/12 EDLA) 2012WL1580772.

Ortego for having complained against Tate.

*Causal Connexity*

Most of Ortego's protected activity included follow-up investigations.  As a result, although her protected acts occurred in 2008 (accommodation request), 2009 (EEOC and DOTD charges), and 2010 (DOTD charge), the investigation of Ortego's charges occurred from 2009 to when she was terminated in 2012.  The EEOC made an on-site visit of District 62 in July, 2011.[122]

DOTD itself provided the best evidence that its suspension and termination of Ortego were done in retaliation for Ortego filing EEOC and in-house complaints alleging ADA and Title VII violations.  In its two letters on September 9, 2011 to Ortego announcing her suspension and upcoming termination, it explained why it was disciplining her.[123]  DOTD's Connie Standige stated,

> Over the course of the past several years, you have repeatedly filed false complaints and false charges of harassment against Ms. Sheila Tate, District 62 Assistant District Administrator for Business.  Your false charges and complaints have created a hostile work environment.[124]

The charges and complaints were listed by section regarding the ADA accommodation request in 2008, the EEOC charge, the 2009 DOTD harassment charge, the 2010 DOTD charge of harassment, the police complaints, and her complaint she should not have

---

[122] Ex. 10.

[123] Ex. 25; Ex. FF.

[124] Ex. FF.

been reprimanded after the computer investigation.[125]  The pre-termination letter

blamed the hostile work environment on Ortego for having filed charges against Tate.[126]

 As a result, DOTD argued, she violated DOTD PPM No. 29 and was to be dismissed.[127]

These letters, therefore, link Ortego's protected activity as early as October, 2008 to

DOTD's suspending her in 2011 and terminating her in 2012.

Additional evidence proving retaliation regarding Ortego's request for an

accommodation in October, 2008 is the closeness in time between her request and

discussion of the accommodation request and the damage.  Days after Tate denied

Ortego an accommodation of ten-hour days and a four-day work week, Ortego spoke

with her. [128] Ortego told her that she desired the accommodation to enable her to have

doctor appointments on the off-day.  When Ortego told her that it was her supervisors'

idea to ask for the accommodation, Tate became angry and told her that there would

not be any more schedules with ten-hour days.[129]  Hours later, Tate announced the

work-schedule change ending ten-hour days and four-day work weeks.[130]   This close

proximity of time and Tate's words to Ortego show that Tate did this because Ortego

asked for the accommodation and because her supervisors suggested she ask for it.

---

[125]  *Id.*

[126]  Ex. FF.

[127]  *Id.*

[128] Ex. 5 at 88–93.

[129]  *Id.*

[130]  *Id.*

This was retaliatory in that it used an invalid business reason for ending this accommodation for Ortego and others of a chance at this accommodation.  It was also retaliatory because Tate knew or should have known that by deciding to end the ten-hour days hours after visiting with Ortego regarding an accommodation about ten-hour days, the employees would understand this as partly Ortego's fault and retaliate against Ortego for having spoken to Tate.  Had Ortego not asked for the accommodation, the schedule change would never have happened.

*Burden shift*

DOTD provided reasons for the retaliation that ostensibly were legitimate non-retaliatory reasons.  As to the work-schedule change, DOTD's business reasons were to decrease idle time and the change was necessary because the work-hour schedules were no longer working; and because Tate was attempting to optimize efficiency in the section due to budgetary restraints.[131]  The ten-hour days had been available for nineteen years at District 62 and only Tate found that they had to be removed.[132]  Supervisor McKinney was unaware of any planning for the schedule change prior to its enactment and knew of no problem with idle time.[133]  Little explanation was made available initially and it was not until six days after its announcement that more

---

[131]  Ex. N; Ex. 12; *see* DOTD's memorandum Ex. KK.

[132]  Ex. 11.

[133]  *Id.*

detailed reasons were provided.[134]  Whatever business reason there may have been for it, DOTD agreed to return the old schedules after being in effect only 3.5 months.[135]

A DOTD investigation of Tate found all six complainants to a charge against Tate figured the schedule change came as a result of Ortego's meeting with Tate and not for any business reasons.

As to the DOTD reasons that it suspended and terminated Ortego because she had violated DOTD PPM No. 29, the DOTD notices to her explain that the hostile work environment that was found at District 62 was Ortego's fault.[136]  Specifically, she created the hostile work environment when she had filed EEOC charges, DOTD in-house complaints that alleged ADA and Title VII violations, and the police complaints filed against Tate.[137]  Whatever disturbance that Ortego produced by filing the complaints were protected activities under the law and cannot be considered as producing a hostile work environment that requires dismissal regardless of the DOTD policy.

Although DOTD claimed Ortego was insubordinate, no evidence of any insubordination or inadequate performance is found in her annual evaluations from 2009 to 2011.[138]

---

[134] Ex. N.

[135] Ex. 1.

[136] Ex. FF; Ex. HH.

[137] *Id.*

[138] Ex. 4.

As to the DOTD accusation in its memorandum that Ortego had improperly released confidential information from an investigation, there is no mention of this allegation in the pre-deprivation or termination notices to Ortego.[139]  It was mentioned in Connie Standige's deposition but Plaintiff is unaware of any other reference to this.[140]

As to the charge that Ortego should not have complained that she was given extra duties after the computer investigation, where Tate found Ortego having been on the computer sometime for 5.5 hours straight on non-work internet sites.[141]  Ortego's own supervisor criticized DOTD and Tate for having given her more duties supposedly for spending time on non-work sites on the computer.[142]  She wondered why no one else was investigated for computer use.  She found DOTD's allegation of continuous hours of viewing non-work internet sites preposterous.[143]

### 3.  ADA harassment claim:  Material facts in genuine dispute when DOTD held Ortego up to months of ridicule and years of haassment

DOTD in its memorandum provided an abbreviated list of harassment with its omission of the six months of criticism and complaints for having caused the loss of four-day work weeks.  All of the acts listed above for retaliatory acts are also part of this harassment claim including the six-month suspension and subsequent termination.

---

[139]  Ex. FF; Ex. HH.

[140]  Ex. 12.

[141]  Ex. 11. at its ex. 1.

[142]  *Id.*

[143]  *Id.*

*Prima Facie—Disability Harassment*

The elements to a claim of disability-based harassment are the following:  (i) that she belongs to a protected group; (ii) that she was subjected to unwelcomed harassment; (iii) that the harassment was based on her disability; and (iv) that the harassment affected a "term, condition, or privilege" of her employment.[144]

DOTD erred in including a fifth element that relieved the defendant of liability if it took remedial action upon knowledge of the harassment.  There is no such fifth element if there is the tangible employment action of termination which is found here.[145]

*Term, Condition, or Privilege of Ortego's Employment Affected*

Ortego had epilepsy and so had a disability under the ADA.  She was subject to unwelcomed harassment because of her disability as described below.

The most severe form of harassment encountered by Ortego was to be ostracized and criticized for having, the employees thought, caused the work-schedule change.[146] This change was particularly hard on some employees that had been on ten-hour day schedules for years or whose spouses had, too, and any coordination among spouses was lost.  Employees were especially angry at this and some of the hostile work environment was placed on Ortego.[147]  Some of that tension is evident in the hand-

---

[144]  *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235–36 (5th Cir.2001).

[145]  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763–764 (1998).

[146]  Ex. 5 at p. 95.

[147]  Ex. 1.

written notes Ortego wrote during that period.[148]  For example, co-worker Duvic would

not talk to her.[149]  Ortego overheard Duvic say "she [Ortego] had to go to Shelia [Tate]

and run her head!!!  Now, we are all working these crazy hours because of her....".[150]

Ortego, as late as May, 2009 shortly before the schedule ended remarked how "someone

is always talking about these schedules and how unfair it is and how they hate this

rotation and how it never happened until me and Shelia [Tate] had that meeting.  I stay

nervous all the time (I can't keep on like this)."[151]

*DOTD contends it took remedial action*

As this is a tangible employment action, DOTD's remedial action is not relevant

to this claim.[152]

### 4.  1ˢᵗ Amendment speech claim:  Material facts in genuine dispute where DOTD's Connie Standige terminated Ortego for filing police complaints of road rage/stalking against DOTD's Tate

DOTD's Connie Standige's pre-deprivation and termination letters to Ortego

provide proof that Ortego was suspended and terminated due to her filing police

complaints (along with other complaints) against Tate.

*Prima Facie Case—Free Speech*

---

[148]  Ex. 6.

[149]  Ex. 6 at 1484.

[150]  Ex. 6 at 1495.

[151]  Ex. 6 at 1505.

[152]  *Ellerth*, 524 U.S. at 763-764.

To establish a First Amendment retaliation claim, Ortego must show that (i) she suffered an adverse employment decision; (ii) her speech involved a matter of public concern; (iii) her interest in commenting on matters of public concern ... outweigh[s] the Defendant's interest in promoting efficiency; and (iv) her speech motivated the adverse employment decision.[153]  An employee speaks on a matter of public concern when his speech addresses "any matter of political, social, or other concern to the community."[154]  If Ortego can prove causation, then the burden shifts to Defendants to show by a preponderance of the evidence that they would have come to the same conclusion in the absence of the protected conduct.[155]

*Analysis*

Defendant Standige in the Defendants' memorandum does not dispute that Ortego suffered an adverse employment actions when she was suspended and terminated.  As to whether her speech touched on matters of public concern, reporting criminal conduct is considered a matter of public concern.  In *Kennedy v. Sheriff of E. Baton Rouge*, the court found that a report to law enforcement of possible counterfeiting was a matter of public concern.[156]  In this case, Ortego's report to law enforcement of possible criminal activity, road rage/stalking, would, too, be a matter of public concern

---

[153] *Beattie v. Madison County School District*, 254 F.3d 595, 601 (5th Cir.2001).

[154] *Mayes v. Galveston County Juvenile Detention Center*, 2002 WL 432652, at 2 (5th Cir.2002).

[155] *Id.*

[156] 05-1418, 935 So. 2d 669, n. 6 (La. 7/10/2006) n. 6.

and issues of safety to the community.

As to whether Connie Standige was motivated to terminate Ortego because of her speech, Standige's pre-deprivation and termination letters provide proof.[157]  In those letters, Standige contends that Ortego's police complaints (and other charges) were falsely made against Tate.  As a result, Standige argued, Ortego created a hostile work environment.[158]  Standige, too, found that filing false charges was insubordination since she did not consider the charges valid.  Ortego, Standige argued, violated DOTD PPM No. 29 and this required dismissal.[159]  The letters, therefore, state that Standige was motivated by Ortego's filing the police charges against Tate and motivated to terminate Ortego.  The police complaints were not false charges and the reason stated for firing Ortego, therefore, is unlawful.

### 5.  State law claims

Ortego also has filed claims under the Louisiana Employment Discrimination Law and the Louisiana Constitution on speech grounds, but the analyses under LEDL and, generally, the constitutional speech claim do not differ from that for the equivalent federal claims.  As a result, for the same reasons listed above, the Defendants' Motion for Summary Judgment should be denied.

---

[157]  Ex. FF; Ex. HH.

[158]  *Id.*

[159]  Ex. FF; Ex. HH.

## V.  CONCLUSION

For all the foregoing reasons and those previously articulated, Jodee Ortego

respectfully requests that Defendants' Motion for Summary Judgment be denied.

Respectfully submitted,

BELL LAW FIRM, LLC

_____*/s/ Paul F. Bell*_____
Paul F. Bell, La. Bar Roll No. 30391
4949 Tulane Drive
Baton Rouge, LA  70808
225-284-3235; 888-812-7933 fax;
bz9@cox.net

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing, exhibits, and other pleading
has been served on all counsel of record by filing with the Court's electronic filing
system on this 28th day of January, 2014.

_____/s/ Paul F. Bell_____
Paul F. Bell, Attorney for Plaintiff

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**JODEE ORTEGO**                               \* **CASE NO. 13-836**

**VERSUS**                                     \* **JUDGE CARL J. BARBIER**
                                               \* **MAG. JUDGE J.C. WILKINSON**

**DOTD AND CONNIE STANDIGE**       \* **SECTION "J"(2)**

**RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF FACT**
**AND**
**PLAINTIFF'S STATEMENT OF PROPOSED FACTS**

**Comes now,** Plaintiff Jodee Ortego who files her response to

defendant's proposed findings of facts and she files her own proposed

findings of facts in response when necessary.

1. Jo-Dee L. Ortego (hereinafter "Ortego" or "plaintiff") is a former employee of the Louisiana Department of Transportation and Development (hereinafter "DOTD").

Responding party's response:  No dispute.

2. On September 5, 2012, Ortego filed a petition for damages against DOTD in the 21st Judicial District Court, Tangipahoa Parish, State of Louisiana.

Responding party's response:  No dispute.

3. Ortego asserted claims against DOTD under the Americans with Disabilities Act, 42 U.S.C. §12101, et seq. (hereinafter "ADA"), Louisiana law, and a constitutional claim under 42 U.S.C. §1983.

Responding party's response:  No dispute.

4. Ortego amended her petition on December 6, 2012 to add Connie Standige (hereinafter "Standige"), individually and in her official capacity, as a defendant.

    Responding party's response:  No dispute.

5. Ortego's amended petition also adopted the allegations made in her original complaint and asserted a claim against Standige arising under 42 U.S.C. §1983 for a violation of Ortego's right to free speech.

    Responding party's response:  No dispute.

6. Service was effectuated on Standige on March 20, 2013.5 The matter was removed to this Honorable Court on April 15, 2013.

    Responding party's response:  No dispute.

7. At all times pertinent herein, Ortego was employed with DOTD at the District 62 offices located in Hammond Louisiana.

    Responding party's response:  No dispute.

8. Ortego began her employment with DOTD in 2005; throughout her employment at District 62, Ortego worked in the stockroom as a stockroom clerk.

    Responding party's response:  No dispute.

9. DOTD notified Ortego that she was being recommended for dismissal and was suspended with pay on September 9, 2011 for violation of Policy and Procedure Memorandum (hereinafter "PPM") No. 29: Employee Conduct.

    Responding party's response:  No dispute.

10. DOTD notified Ortego of its decision to terminate her from employment with DOTD on February 20, 2012 for violation of PPM No. 29: Employee Conduct.

Responding party's response: Disputed.  DOTD wrote letter on February 19, 2012 to Ortego of its decision to terminate her from employment with DOTD.  It mailed it the next day and Ortego received it within days.[160]

11. The alleged acts giving rise to this lawsuit occurred between October of 2008 and her termination from employment with DOTD in February of 2012.

Responding party's response:  No dispute.

12. During this time period, Karen Dunnington (hereinafter "Dunnington"), the stockroom supervisor, was Ortego's immediate supervisor.

Responding party's response:  No dispute.

13. Dunnington reported to Sharon "Sherry" McKinney (hereinafter "McKinney"). McKinney reported to Ronda Rylatt (hereinafter "Rylatt"); Rylatt reported directly to Sheila Tate (hereinafter "Tate").

Responding party's response:  No dispute.

14. At all times pertinent herein, Tate served as the Assistant District Administrator at District 62 with supervisory authority over eighteen to twenty DOTD employees at the district; including Ortego.

Responding party's response:  No dispute.

15. Connie Standige (hereinafter "Standige") served as District Administrator of District 62 prior to 2008 and again from 2011 through the end of Ortego's employment with DOTD in 2012.

Responding party's response: Disputed.  Connie Standige (hereinafter "Standige") served as District Administrator of District 62 prior to February, 2009 and again from July 19, 2010 through the end of Ortego's employment with DOTD in 2012.[161]

---

[160] Ex. 2.

[161] Ex. 3.

16. Standige had supervisory authority over all employees working at District 62; she was Tate's direct supervisor from 2011-2012.

    Responding party's response:  No dispute.

17. It is Tate and Standige who Ortego alleges violated her rights under the ADA. It is Standige who Ortego alleges violated her rights under the First Amendment.

    Responding party's response:  No dispute.

18. The deadline to complete discovery has elapsed as has the deadline to submit witness and exhibit lists.

    Responding party's response:  No dispute.

19. The evidence demonstrates that DOTD reasonably accommodated Ortego's known disability.

    Responding party's response:  Disputed.  The evidence demonstrates that DOTD had not reasonably accommodated Ortego's known disability.  Ortego requested and was refused a reasonable accommodation on 10/15/2008.[162]

20. At all times pertinent herein, DOTD had a policy in effect establishing the procedure by which the agency shall maintain compliance with the ADA.

    Responding party's response:  No dispute.

21. Ortego submitted a formal request for an ADA accommodation on November 3, 2008 wherein she requested to work a non rotating schedule to accommodate her epilepsy.

    Responding party's response:  No dispute.

22. Ortego's November 3, 2008 ADA accommodation request was granted on

---

[162] Ex. 11.

November 7, 2008.

    Responding party's response: No dispute.

23. October 20, 2008, Ortego submitted a work change request form pursuant to DOTD's PPM 10 establishing the agency procedure for requesting work schedule changes.

    Responding party's response: Disputed. Ortego submitted a work change request on October 14, 2008 to her supervisors.[163]  Ortego submitted the request pursuant to the requirements of the Americans with Disability statute.

24. Ortego's treating physician did not advise her to submit this work schedule change; the work schedule change request did not reference the ADA or state that this request was related to her epileptic condition.

    Responding party's response: Disputed.  Ortego's three direct supervisors consulted with Ortego regarding complications at work arising from her treatment and leave taken for her epilepsy.  The supervisors were concerned Ortego could not care for her epilepsy because she had insufficient leave time for doctor appointments.  The supervisors suggested she file a work schedule change to have a work schedule of four 10-hour days per week with one day free for doctor appointments.[164]

25. There is no evidence that Ortego communicated the reason for her initial work schedule change to Tate or that Tate knew that this request was a request based on a disability.

    Responding party's response: Disputed.  McKinney met with Tate and Tate told them that she was tired of accommodating people with FMLA and that there were too many people on FMLA.  McKinney concluded that Tate did not want employees with medical reaons to get

---

[163] Ex. 5 at 94.

[164] Ex. 11 at 82–85; Ex. 17.

accommodations and especially 10-hour work days.[165]

All six employees who were investigated by DOTD involving complaints against Tate claimed that Tate denied the ten-hour day accommodation because Ortego was one of the "FMLA people".[166]

Tate told Ortego on October 23, 2008 regarding her earlier ADA accommodation request:

> On October 23, 2008, Ortego spoke to Tate about wanting the schedule change so that she could go to doctors appointments but Tate was not surprised and said she could not give her a schedule change.  Tate told Ortego that she had denied Ortego's accommodation request because she had wanted to be consistent in her decisions.  She had denied an accommodation request from another disabled employee, Judy Schilling, and so denied Ortego's request, too.  She also asked Ortego what would it look like if she denied a request for a work-schedule change from a black woman like Vanessa Jackson but gave it to Ortego?[167]

Tate told Candy Cardwell that she had been familiar with Ortego's earlier accommodation request and had denied it.  Ex. N.

26. Ortego then contacted Human Resource Analyst Candace Cardwell (hereinafter "Cardwell") for advice regarding requesting an ADA accommodation.

> Responding party's response: Disputed.  Ortego did not contact Human Resource Analyst Candace Cardwell (hereinafter Cardwell) after Tate refused providing her with ten-hour work days on October 15, 2008.[168] Tate ended the ten-hour days and instituted rotating 5-day work weeks on October 29, 2008.[169]  Ortego asked Tate for a fixed work schedule on October 29, 2008 to help her prevent seizures due to the rotating work

---

[165] Ex. 11.

[166] Ex. 1.

[167] Ex. 5 at 88–93.

[168] Ex. 11.

[169] Ex. 5 at 88–93.

schedule.  Tate refused and suggested Ortego take her medication prior to work to stop seizures.[170]  Ortego then contacted Cardwell for advice regarding requesting an ADA accommodation.[171]

27. Ortego took Cardwell's advice and submitted a formal ADA request on November 3, 2008.

   Responding party's response:  No dispute.

28. Ortego's ADA request was granted on November 7, 2008.

   Responding party's response:  No dispute.

29. Ortego was allowed to work a non-rotating schedule and never had to work a rotating schedule.

   Responding party's response:  No dispute.

30. The evidence demonstrates that DOTD did engage in the interactive process mandated by the ADA.

   Responding party's response: Disputed.  DOTD did not engage in an interactive process regarding Ortego's first accommodation request for four-day work weeks.  Tate refused the request by simply stating that she was tired of accommodating FMLA people.[172]  No further discussion with Ortego's supervisors or Ortego occurred regarding that request. Ortego asked for non-rotating schedule but Tate refuses.[173]  Ortego contacts Cardwell regarding an accommodation.[174]  DOTD engaged in interactive discussion with Ortego regarding her second accommodation request for non-rotating 5-day week work schedule.[175]

---

[170] Ex. 5 at 102–4.

[171] Ex. 5 at 80–81.

[172] Ex. 11

[173] Ex. 5 at 102–104.

[174] Ex. 5 at 80–81.

[175] Ex. 5 at 105–106.

31. Cardwell assisted Ortego in requesting and obtaining the ADA accommodation requested.

     Responding party's response:  No dispute.

32. Tate also engaged in the interactive process.

     Responding party's response: Disputed.  Tate did not engage in any interactive discussion with Ortego or Ortego's supervisors regarding her request for 4-day work-week schedule.[176]  Tate initially refused to participate in interactive discussion, but with prodding finally did regarding Ortego's request for non-rotating 5-day work-week schedule.[177]

33. Upon receiving Ortego's ADA request on November 3, 2008, Tate forwarded the request to Cardwell.

     Responding party's response:  No dispute.

34. Ortego and Cardwell engaged in discussions to determine if Ortego's requested accommodation was appropriate.

     Responding party's response: No dispute as to Ortego's second accommodation request.

35. Tate also granted Ortego's accommodation when HR recommended that Ortego be allowed the ADA accommodation.

     Responding party's response: No dispute regarding Ortego's second accommodation request.

36. The evidence in the record is insufficient with respect to essential elements of Ortego's disability based retaliation claim, and the evidence shows legitimate non-retaliatory reasons for the defendants' actions.

---

[176] Ex. 5 at 84; Ex. 11.

[177] Ex. 5 at 104–105.

Responding party's response: Disputed.  The evidence is sufficient with respect to essential elements of Ortego's ADA retaliation claim and the evidence shows non-legitimate retaliatory reasons for the defendants' actions:

Tate ended four-day work weeks to hurt Ortego and Ortego's supervisors for having asked for an ADA accommodation (a protected activity under the ADA).[178]

On October 23, 2008, Ortego spoke with Tate about her refusal of Ortego's accommodation request.[179]  When Ortego told Tate Ortego's direct supervisors brought up the idea of the accommodation, Tate became very angry.[180]  Tate told Ortego that her supervisors were taking advantage of her and setting her up.[181]  She claimed that she could not give a white disabled employee like Ortego an accommodation while not giving one to a Black woman like Vanessa Jackson.  Otherwise Tate would be setting herself up.[182]  She said in a loud voice, "The Tens will be going" referring to the end of ten-hour days and a four-day work week.[183]

Tate ended the four-day work week hours after Ortego spoke with Tate about her accommodation.[184]  All six employees interviewed by DOTD in an investigation of complaints against Tate surmised that the timing of the meeting and the schedule change indicate that it was because of Ortego's meeting with Tate.[185]

Tate retaliated against Ortego when Tate filed a frivolous lawsuit against Ortego on May 23, 2011.[186]  In the same suit, she also sued

---

[178] Ex. 5 at 88-93.

[179] Ex. 5 at 90.

[180] Ex. 5 at 89-91.

[181] Ex. 5 at 90-91.

[182] Ex. 6 at 1479-1483.

[183] Ex. 6 at 1480.

[184] Ex. 5 at 89-91.

[185] Ex. 1.

[186] Ex. 7 at para 41.

DOTD, top officials at DOTD, and DOTD investigators and Paula Berwick who took over Tate's previous position at the offices. Tate stated in her complaint that Ortego was sued because she had filed charges against Tate of EEOC charge of ADA violations, DOTD charges complaining of ADA violations, and because Ortego had filed police charges against Tate's road rage/stalking against Ortego. *Id.* This shows that even on May 23, 2011 when the complaint was filed, Tate was very concerned that Ortego had done her federally protected activity between 2008 and 2010.

Tate retaliated against Ortego when she harassed Ortego at work. As explained by a supervisor of Ortego, "[i]t is a known fact that Shelia hates Jodee and is singling her out to bully and bash."[187] This bullying included investigating only Ortego's computer and assigning additional duties to Ortego. The additional duties were supposedly due to surfing the web but no other employees were examined to determine if they, too, were surfing the web. Supervisor McKinney thought the assignment of extra duties to Ortego was unfair.[188]

DOTD wrote to Ortego recommending dismissing her and dismissing her.[189] In those letters, DOTD explained that it fired her for filing EEOC charges, filing in-house DOTD charges that DOTD had violated the ADA, and for filing police complaints against Tate for her road rage/stalking against Ortego.[190] DOTD, therefore, retaliated against Ortego for her protected activity in filing EEOC charges and making complaints to her supervisor that the agency had and was violating the ADA.

The evidence shows illegitimate retaliatory reasons for the defendants' actions. Ending four-day work weeks to retaliate against a person because she asked for an accommodation and because her three direct supervisors suggested the accommodation are not legitimate reasons. Supervisor McKinney spent 19 years at DOTD and she and her co-

---

[187] Ex. 9.

[188] *Id.*

[189] Ex. FF; Ex. HH.

[190] *Id.*

workers were denied ten-hour days once and that was when Tate ended
them in 2008.[191]  Tate's new schedule lasted 3.5 months before a SWOT
meeting was held where DOTD officials agreed the schedules would
end (and did on May 18, 2009).[192]

37. Ortego first submitted an ADA request on November 3, 2008.

  Responding party's response: Disputed.  Ortego submitted her second
  ADA request on November 3, 2008.[193]

38. Ortego is unable to show that she engaged in a protected activity prior to
November 3. 2008.

  Responding party's response: Disputed.  Ortego is able to show that she
  engaged in a protected activity prior to November 3. 2008.  Ortego
  asked for an accommodation on October 15, 2008.  It was refused.[194]
  When she spoke to Tate about the refusal, Tate retaliated against her
  because Ortego asked for an accommodation after her supervisors had
  first suggested it to her.[195]

39. The only adverse action that Ortego is able to show for the purposes of her
disability based retaliation claim is termination from employment.

  Responding party's response: Disputed.  Ortego suffered besides the
  adverse action of termination, six months of suspension,[196] and other
  retaliatory treatment severe enough that it could well dissuade a
  reasonable worker from asking for an accommodation.  The other
  retaliatory treatment included Tate orchestrating an end to the four-
  day work week and blaming it on Ortego.[197]  Tate ending the four-day
  work week because Ortego had asked for an accommodation after her

---

[191] Ex. 11.

[192] Ex. 1.

[193] Ex. 5 at 107, 82–83; Ex. 11.

[194] Ex. 11.

[195] Ex. 5 at 89–91.

[196] Ex. 25; Ex. FF.

[197] Ex. 5 at 89–91; Ex. 1

supervisors suggested it to her.[198]  Tate bullying of Ortego[199] and Tate suing Ortego in federal court for Ortego having engaged in protected activity,[200] and other Tate mistreatment of Ortego.[201]

40. Ortego is unable to establish a causal nexus between the protected activities and the adverse action(s) she alleges to have endured.

> Responding party's response: Disputed.  Ortego establishes a causal nexus between her protected activities and the adverse actions she has alleged.

> When Tate retaliated against Ortego in May, 2011 by filing a frivolous lawsuit alleging Ortego somehow had violated laws for having done protected activities under the ADA between 2008 and 2011 (and discussed elsewhere here), Tate showed that she was still retaliating against Ortego for protected activity that Ortego had done years earlier.[202]

> Tate's lawsuit shows co-workers of Ortego that should they file charges against Tate and DOTD for ADA violations, they risk being singled out and sued by Tate.[203]

> When DOTD notified Ortego that she would be dismissed and, later, dismissed, it explained in letters that the actions were done because of the protected activities she did.  Specifically, she was fired for having filed the EEOC charge alleging ADA violations, and the DOTD in-house complaints alleging harassment due to having filed charges against DOTD of ADA violations against Tate and for having refused an accommodation request.[204]

---

[198] Ex. 5 at 89–91.

[199] Ex. 9.

[200] Ex. 7 at para 41.

[201] Ex. 5 at 147–161.

[202] Ex. 7 at para 41.

[203] *Id.*

[204] Ex. FF; Ex. HH.

41. Ortego made an ADA accommodation request on November 3, 2008. Ortego lodged a formal EEOC charge on March 2, 2009.

      Responding party's response:  No dispute.

42. Ortego is unable to establish a causal connexity between her November 3, 2008 ADA accommodation request and the alleged retaliatory conduct that predated her ADA request.

      Responding party's response: No dispute.

43. Ortego is also unable to establish the causation element has to her claim of retaliatory termination.

      Responding party's response:  Disputed.  Proof of the causation element in Ortego's claim of retaliatory termination is found in DOTD's letters notifying Ortego that DOTD would dismiss her and, later, terminating her for having engaged in the protected activities of filing EEOC and in-house charges of ADA violations.  DOTD, too, claimed it fired her for having filed police charges against Tate's road rage/stalking.[205]

44. DOTD advised Ortego that she was being recommended for dismissal and was suspended with pay on September 9, 2011.

      Responding party's response:  No dispute.

45. DOTD notified Ortego of its decision to terminate her from employment with DOTD on February 20, 2012.

      Responding party's response:  Disputed.  DOTD wrote letter on February 19, 2012 to Ortego of its decision to terminate her from employment with DOTD.  It mailed it the next day and Ortego received it within days.[206]

---

[205]  Ex. FF; Ex. HH.

[206]  Ex. 2.

46. These acts occurred well beyond five months after the last alleged "protected activity" on March 2, 2009.

> Responding party's response: Disputed. Ortego opposed the unlawful employment practices of harassment and retaliation from Tate's road rage incidents on September 27, 2010 and July 29, 2011.[207]  The suspension occurred 5 weeks after that protected activity, lasted six months and termination immediately followed.[208]

47. The plaintiff is without other evidence necessary to meet the causation requirement as to her termination.

> Responding party's response:  Disputed.  See response to Facts #36 (elements of retaliation claim) and #43 (causation for retaliatory termination).

48. The two alleged stalking incidents occurred on September 27, 2010 and July 29, 2011, respectively.

> Responding party's response:  No dispute.

49. There was not "close timing" between Ortego's protected activities and these events.

> Responding party's response:  No dispute.

50. The plaintiff is without other evidence necessary to meet the causation requirement as to these acts.

> Responding party's response:  Disputed.  Although not close timing between the protected activity and the retaliation, there was close timing between Tate's tardy retaliation for protected activity and additional retaliation.  Tate retaliated against Ortego when she filed a frivolous lawsuit alleging that Ortego had violated the law when she engaged in protected activities.  She filed this act of retaliation on

---

[207] Ex. FF.

[208] Ex. 25; Ex. FF.

September 14, 2010 and thirteen days later also did the retaliatory act of her first road rage incident against Ortego.[209]

The EEOC made an on-site investigation of DOTD's District 62 regarding Ortego's and others' charges twenty-two days before Tate confronted Ortego in her second road rage incident (7/7 and 7/29/2011).[210]

Tate had singled out Ortego for harassment.  Tate only sued two employees in District 62.  One was Paula Berwick who worked in the job Tate once had and Ortego.  Ortego was in a position of the lowest possible rank.  Berwick and Ortego complained of Tate's conduct, but at least four others had, too.[211]

51. Ortego is unable to establish the causation element as to all remaining alleged incidents of retaliation.

> Responding party's response:  Disputed.   See response to Facts #36 (elements of retaliation claim) and #43 (causation for retaliatory termination).

52. There is no evidence of "close timing" between Ortego's protected activities and these events.

> Responding party's response:  Disputed.  *It appears DOTD is referring to protected activities and the retaliatory events other than termination and road rage/stalking.*

Ortego met with Tate and told Tate on the morning of October 23, 2008 that her earlier accommodation request had been done at the instigation of her three direct supervisors.  When Tate heard of that she became angry and announced she would end the type of accommodation Ortego asked for.  Also, she would end it for all employees.  Hours later Tate

---

[209] Ex. 7 at para 41. Ex. FF.

[210] Ex. FF; Ex. 10.

[211] Ex. 7 at para 41; Ex. 1.

announced the end of the ten-hour day work schedule.[212]

53. Ortego is without other evidence to tending to demonstrate causation.

> Responding party's response:  Disputed.   See response to Facts #36 (elements of retaliation claim) and #43 (causation for retaliatory termination).

54. There record is void of evidence that Tate singled Ortego out or retaliated against her on the basis of her disability.

> Responding party's response:  Disputed.  Evidence that Tate singled out Ortego for retaliation or harassment follows:
>> Tate sued two of eighteen employees in District 62.  One was Paula Berwick who worked in the job Tate once had and the other Ortego.  Ortego was in the lowest-ranked position at the District. Berwick and Ortego complained of Tate's conduct, but at least four others had, too.[213]
>>
>> McKinney observed that it was a well known fact that Tate singled out Ortego to bully and bash.[214]

55. The defendants are able to show legitimate, non-retaliatory reasons for its actions.

> Responding party's response:  Disputed.  DOTD claims in its pre-termination and termination letters to Ortego that it fired her for violating PPM No. 29 when she filed EEOC and in-house charges of ADA violations and for filing police charges of road rage against Tate.[215] DOTD's reasons for suspending and terminating Ortego are illegitimate and retaliatory actions because they fired her in retaliation for her protected activities.

---

[212] Ex. 5 at 88-93.

[213] Ex. 7 at para 41; Ex. 1.

[214] Ex. 9.

[215] Ex. FF; Ex. HH.

DOTD contended Tate ended four-day work weeks out of legitimate non-retaliatory reasons. Tate told Ortego she ended the four-day work week to harm Ortego and show Ortego's supervisors to not recommend such an accommodation again.[216]  These are not legitimate non-retaliatory reasons for ending the four-day work week.

DOTD agreed to return to four- and five-day work weeks 3.5 months after Tate announced the schedule change.[217] Ten hour days had been provided for at least 19 years previously, and the 3.5 month period they were removed was short in comparison indicating it was a failed and made poor business sense.[218]

Tate told McKinney that she was not interested in accommodating "FMLA people".[219] DOTD found that all those who complained of Tate harassment and discrimination found that Tate denied Ortego's first accommodation request because she was "FMLA people".[220] This is not a legitimate reason for refusing accommodations to a disabled person.

56. There were non-retaliatory reasons for the October 2008 work schedule changes.

Responding party's response:  Disputed.  There were only retaliatory reasons for the October 2008 work-schedule changes.  Tate changed the work schedule to end ten-hour days on October 23, 2008 after Ortego told her that her supervisors had suggested ten-hour days to her as an accommodation.  Tate in anger told Ortego she would end the ten-hour day option to end anyone from asking for accommodations or ten-hour days.  Tate did that afternoon.[221]

There is no indication that Tate was to end ten-hour days prior to that.[222]

---

[216] Ex. 5 at 89-91.

[217] Ex. 1.

[218] Ex. 11.

[219] Ex. 11.

[220] Ex. 1.

[221] Ex. 5 at 89-91.

[222] Ex. 11.

When business office employees met with Tate on October 29, 2008 to discuss the end of the ten-hour work days, Tate provided only the briefest explanation for why she ended the ten-hour days.[223] She provided a more detailed list six days after she announced the work-schedule change.[224]

57. On October 23, 2008, Tate implemented a schedule change affecting all employees in the business section.

Responding party's response:  No dispute.

58. Tate observed idle time amongst employees; the work hour schedules in effect were no longer working for the section; and Tate was attempting to optimize efficiency in the section due to budgetary restraints.

Responding party's response:  Disputed.  Tate was not attempting to optimize efficiency in the business office when she ended the ten-hour work day schedules.  The work schedule was changed because Tate became angry that Ortego had asked for an accommodation and that Ortego's supervise had suggested she do so.[225]

59. Tate implemented the schedule modifications across the entire section to be fair. The changes were met with fierce opposition from the section's employees; Tate reverted back to the old work schedules on May 14, 2009.

Responding party's response:  Disputed.  The work schedule was modified for the entire section to cause harm for all business office employees because Ortego had asked for an accommodation and because Ortego's supervisors had suggested she ask for the accommodation.[226]  The changes were met with fierce opposition from the business office employees.  DOTD agreed on February 5, 2009 to end the new schedules in May.[227]

---

[223] Ex. 11.

[224] Ex. N.

[225] Ex. 5 at 89-91; Ex. 6 at 1479-1483; Ex. 11.

[226] Ex. 5 at 89-91; Ex. 6 at 1479-1483.

[227] Ex. 1.

60. Ortego was assigned additional work duties for legitimate non-retaliatory reasons.

> Responding party's response: Disputed. Supervisor Sherry McKinney stated that Ortego was assigned additional work duties because Tate was bullying Ortego and that the computer investigation that triggered the extra work duties was unfair.[228]

61. On March 26, 2010, Ortego was found to be misusing DOTD computers.

> Responding party's response: No dispute.

62. At some point subsequent to Ortego's computer misuse, Ortego was assigned additional duties because it was determined that she was without enough work to do.

> Responding party's response: Disputed. Supervisor Sherry McKinney stated that Ortego was assigned additional work duties because Tate was bullying Ortego and that the computer investigation that triggered the extra work duties was unfair.[229]

63. Ortego's computer was confiscated for legitimate non-retaliatory reasons.

> Responding party's response: Disputed. It is unclear why DOTD confiscated Ortego's computer.[230]

64. Ortego's computer was temporarily taken on March 31, 2010 because it had contracted a virus caused by Ortego's computer misuse.

> Responding party's response: Disputed. There is no evidence that Ortego's computer contracted a virus due to Ortego's computer misuses. DOTD computer investigators concluded that Ortego could not be held accountable for her computer contracting a virus.[231]

---

[228] Ex. 11.

[229] Ex. 11.

[230] Ex. 11.

[231] Ex. 16.

65. Ortego was terminated in 2012 for legitimate non-retaliatory reasons.

> Responding party's response: Disputed. DOTD's notices of pre-termination and termination state that Ortego was fired for filing EEOC charge, filing an in-house charge of ADA violations, and filing police charges against Tate.[232]  These are activities protected by Title VII, the 1st Amendment of the U.S. Constitution and the Louisiana Constitution Art. I, § 7

66. Ortego was terminated from her employment with DOTD for violation of PPM No. 29, Employee Conduct.

> Responding party's response: Disputed. DOTD's notices of pre-termination and termination state that Ortego was fired for violating PPM No. 29 because Ortego had filed EEOC charge, filed an in-house charge of ADA violations, and filed police charges against Tate.[233]  These cannot be violations of PPM No. 29 because these activities are protected by Title and 1st Amendment and La. Const. Art. I, § 7.

67. Ortego was insubordinate in that she failed to provide police reports to supervisors as requested.

> Responding party's response: Disputed. After Ortego filed her police complaint against Tate, Ortego went back to the police but was told the report would only be available after editing was completed.[234]  As a result, through no fault of Ortego, Ortego was unable to provide the document to DOTD when as fast as she had thought she could.  Ortego was not insubordinate in getting the police report to DOTD.

68. Ortego also engaged in conduct unbecoming of a public employee when she disclosed confidential information developed through the course of an agency investigation that to other employees.

> Responding party's response:  Disputed.  DOTD sent notices of

---

[232]  Ex. FF; Ex. HH.

[233]  Ex. FF, HH.

[234]  Ex. 5 at 188–189.

suspension and termination to Ortego but does not mention any charges that Ortego disclosed confidential information developed through the course of an agency investigation to other employees.[235]

69. DOTD management, Human Resources, and other departments were consulted prior to Ortego's dismissal and were involved in approving Ortego's termination.

    Responding party's response:  Disputed.  Only Connie Standige claims such consultation.[236]

70. Nowhere in the record of these proceedings has Ortego denied violating the provisions of PPM No. 29 detailed in her termination notices.

    Responding party's response:  Disputed.  DOTD claimed that Ortego violated PPM No. 29 when she created a hostile work environment by her filing the EEOC complaint, the DOTD charges alleging harassment and retaliation by Tate, and filing police complaints against Tate"s road-rage/stalking incidents.[237] Ortego disputes this and contends that DOTD and Shelia Tate were the ones that created a hostile work environment and dis so against her as a result of her filing the EEOC complaint and having asked for a reasonable accommodation.[238]

71. The evidence in the record is insufficient with respect to an essential element of Ortego's disability based harassment claim asserted against the defendants, and DOTD took prompt remedial action.

    Responding party's response: Disputed.  The evidence is sufficient with respect to the essential elements of Ortego's disability based harassment claim.  Ortego has a disability.[239]  Ortego was qualified for the job.  Ex.annual evaluations.  DOTD did not take prompt remedial action when Ortego alerted DOTD of harassment by Tate.  DOTD held SWOT

---

[235]  Ex. FF; Ex. HH.

[236]  Ex. 12.

[237]  Ex. FF; Ex. HH.

[238]  Ex. 5 at 121–122.

[239]  Ex. 5 at 39–60.

meeting and other activity but never disciplined Tate for her harassment of Ortego.[240]

72. The incidents of harassment alleged herein appear too isolated and attenuated to be considered pervasive or severe.

> Responding party's response:  Disputed.  The harassment in its totality are pervasive and severe: i) Tate told Ortego she would and did impose work schedule change that would abolish ten-hour days because Ortego had asked for that accommodation and because Ortego's supervisors had suggested to Ortego she request that accommodation; this harassment made some of Ortego's co-workers especially angry at her because had she not spoken with Tate, it would never have happened and blamed Ortego for it;[241] ii) Tate, at the same time she imposed the work schedule change, declared breaks had to be taken at a pre-assigned time else they were lost;  its closeness in time to the other change indicated that both work schedule and break changes were due to Ortego's talking to Tate;[242] iii) Tate sued Ortego because she and listed reasons for doing so that Ortego had Ortego had done actions that federal law protects against retaliation:  Ortego filed an EEOC complaint against her, Ortego filed DOTD harassment complaints against her, Ortego filed police complaints against Tate's road rage/stalking;[243] iv) Tate amended her lawsuit against Ortego to include accusations that Ortego had lesbian associations;[244]  v) DOTD harassed Ortego by suspending and terminating her:  DOTD explained in its letters announcing Ortego was suspended and, later, terminated because Ortego had filed EEOC and DOTD complaints that address ADA accommodations indicating that the harassment even included suspension and termination;[245]  v) Tate followed closely and threatened Ortego in two incidents of road rage; these occurred within two weeks after Tate filed her EEOC charge against Ortego and when EEOC

---

[240]  Ex. 1.

[241]  Ex. 5 at 89-91.

[242]  Ex. 1.

[243]  Ex. 7 at para 41.

[244]  Ex. 8 at para. 41.

[245]  Ex. 25; Ex. FF; Ex. HH.

investigated District 62 on-site regarding Ortego and others' complaints.[246]

73. Ortego has identified four incidents where she felt that Tate harassed her spanning the course of four years; she further described Tate to be a difficult supervisor and indicated that she and Tate did not get along.

> Responding party's response:  Disputed.  Ortego identified nine incidents in her deposition as what could be harassment.[247]

74. Ortego is without evidence that the alleged disability harassment occurred or that Tate singled her out on the basis of her disability beyond her own testimony.

> Responding party's response:  Disputed.  Besides Ortego's testimony, Ortego's supervisors stated that Tate was tired of accommodating FMLA people and this included refusals to grant 10-hour days.[248] Also, it was only hours after Ortego spoke to Tate about the accommodation request that Tate instituted the work and break schedule change.[249] There was no previous discussion that such a major change in work and break schedules would occur.[250]

> Tate sued two of eighteen employees in District 62.  One was Paula Berwick who worked in the job Tate once had and the other Ortego. Ortego was in the lowest-ranked position at the District.  Berwick and Ortego complained of Tate's conduct, but at least four others had, too.[251]

> McKinney observed that it was a well known fact that Tate singled out Ortego to bully and bash.[252]

---

[246]  Ex. 10; Ex. FF; Ex. 7 at para 41.

[247]  Ex. 5 at 161.

[248]  Ex. 11.

[249]  Ex. 5 at 88-93.

[250]  Ex. 5 at 88-93; Ex. 11; Ex. 6at 1479-1483.

[251]  Ex. 7 at para 41. Ex. 1.

[252]  Ex. 9.

Tate ended the four-day work week hours after Ortego spoke with Tate about her accommodation.[253] All six employees interviewed by DOTD in an investigation of complaints against Tate surmised that the timing of the meeting and the schedule change indicate that it was because of Ortego's meeting with Tate.[254]

Tate retaliated against Ortego when Tate filed a frivolous lawsuit against Ortego on May 23, 2011.[255] In the same suit, she also sued DOTD, top officials at DOTD, and DOTD investigators and Paula Berwick who took over Tate's previous position at the offices.   Tate stated in her complaint that Ortego was sued because she had filed charges against Tate of EEOC charge of ADA violations, DOTD charges complaining of ADA violations, and because Ortego had filed police charges against Tate's road rage/stalking against Ortego.[256]   This shows that even on May 23, 2011 when the complaint was filed, Tate was very concerned that Ortego had done her federally protected activity between 2008 and 2010.

Tate retaliated against Ortego when she harassed Ortego at work.  As explained by a supervisor of Ortego, "[i]t is a known fact that Shelia hates Jodee and is singling her out to bully and bash."[257] This bullying included investigating only Ortego's computer and assigning additional duties to Ortego.  The additional duties were supposedly due to surfing the web but no other employees were examined to determine if they, too, were surfing the web.  Supervisor McKinney thought the assignment of extra duties to Ortego was unfair.[258]

DOTD wrote to Ortego recommending dismissing her and, later, dismissing her.[259] In those letters, DOTD explained that it fired her for filing EEOC charges, filing in-house DOTD charges that DOTD had

---

[253] Ex. 5 at 89-91.

[254] Ex. 1.

[255] Ex. 7 at para 41.

[256] *Id.*

[257] Ex. 9.

[258] *Id.*

[259] Ex. FF; Ex. HH.

violated the ADA, and for filing police complaints against Tate for her road rage/stalking against Ortego.[260]  DOTD, therefore, retaliated against Ortego for her protected activity in filing EEOC charges and making complaints to her supervisor that the agency had and was violating the ADA.

The evidence shows illegitimate retaliatory reasons for the defendants' actions.  Ending four-day work weeks to retaliate against a person because she asked for an accommodation and because her three direct supervisors suggested the accommodation are not legitimate reasons.[261]  Supervisor McKinney spent 19 years at DOTD and she and her co-workers were denied ten-hour days once and that was when Tate ended them in 2008.[262] Tate's new schedule lasted 3.5 months before a SWOT meeting was held where DOTD officials agreed the schedules would end (and did on May 18, 2009).[263]

Others met with Ortego after the road rage incidents and testified she was terrified and that this was not an act.[264]

75. The October 2008 work schedule changes complained of and other management tactics were met with opposition from business office employees.

     Responding party's response:  No dispute.

76. DOTD Quality and Continuous Improvement Manager/Facilitator Lisa Leonard conducted a SWOT meeting with employees within the business group on February 5, 2009.

     Responding party's response:  No dispute.

77. The purpose of the meeting was to assess the strengths and weaknesses of the group, to address some of the complaints made by employees, and to "try

---

[260] *Id.*

[261] Ex. 5 at 88-93; Ex. 6 at 1479-1483.

[262] Ex. 11.

[263] Ex. 1.

[264] Ex. 11.

and make things better".

 Responding party's response: No dispute.

78. On May 7, 2009, Ortego filed a harassment complaint with the Human Resources Department at DOTD Headquarters through the DOTD grievance procedure.

 Responding party's response: No dispute.

79. DOTD Human Resource Discipline Specialist Linda Pelloquin visited the District on May 8, 2009, investigated Ortego's complaint, and issued findings.

 Responding party's response: No dispute.

80. By letter dated July 21, 2009, Human Resources Director Susan Pellegrin informed Ortego that an investigation of her complaint revealed insufficient evidence to support her complaint of harassment.

 Responding party's response: No dispute. Note, however, that DOTD erred because it failed to investigate the first accommodation request and the Tate's refusal of that request.

81. In May of 2010, Ortego lodged an additional complaint again maintaining that she was being subjected to unfair treatment at the hands of Tate.

 Responding party's response: Disputed. Ortego claimed that the treatment by Tate was more than just unfair. Although DOTD later claimed there were no disciplinary action against Ortego,[265] it assigned her more duties and included accounting duties that were later removed because they were not within the job description of a clerk.[266] A supervisor claimed that DOTD's action was more bullying by Tate of Ortego and that Ortego had no need for additional duties.[267] DOTD investigator could not ascribe any fault to Ortego for the virus

---

[265] Ex. FF.

[266] Ex. 9; Ex. 11.

[267] Ex. 11.

infection.[268]

82. Ortego's complaint was thoroughly investigated by DOTD.

> Responding party's response:  Disputed.  DOTD did not investigate Ortego's complaint thoroughly.

83. By letters dated February 7 and February 15, 2011, Human Resources Compliance Programs Director Stephanie Ducote informed Ortego that her complaints had been investigated and addressed the complaints raised in Ortego's grievance.

> Responding party's response:  Disputed.  Stephanie Ducot did not fully address the complaints raised in Ortego's grievance as shown by Tate not being reprimanded.[269]

84. DOTD Compliance Programs conducted an additional investigation beginning August 4, 2010 continuing through September 22, 2010 to determine if employee complaints of discrimination and harassment were valid.

> Responding party's response:  No dispute.  Although the sequence of questioning in this pleading indicates an error in indicating that this 2010 investigation occurred after the 2011 investigation.

85. DOTD determined that the complaints about, and discontent with Tate, are too widespread to be attributed to discrimination against a protected group.

> Responding party's response: No dispute. Note, however, that DOTD erred.  In the case of the work-schedule change, it may appear that Tate has harassed all the business office.  Tate told Ortego, though, that she did it because Ortego filed for an accommodation and because Ortego's supervisors first recommended it to her.[270]   The seeming unbiased harassment against all business office employees, therefore, is really due to Tate's discrimination against giving accommodations to the

---

[268] Ex. 16.

[269] Ex. 24.

[270] Ex. 5 at 88-93.

disabled.

86. DOTD investigated Ortego's stalking allegations made against Tate and attempted to help resolve the situation.

> Responding party's response: Disputed. DOTD investigated Ortego's road rage/stalking allegations made against Tate and did not resolve the situation. DOTD did not transfer or reprimand Tate for her harassment against Ortego. Tate only recalls one time that Connie Standige formally counseled or reprimanded Tate while supervising her and that did not involve any Ortego issues.[271] DOTD suspended and fired Ortego in part for filing these police complaints of road rage/stalking against Tate.[272]

87. DOTD ultimately determined that none of the allegations could be substantiated.

> Responding party's response:  No dispute.

88. The evidence in the record is insufficient with respect to essential elements of Ortego's First Amendment retaliation claim, and the evidence demonstrates legitimate nonretaliatory reasons for the defendants' actions.

> Responding party's response:  Disputed.  Ortego met the evidentiary requirements for her First Amendment claim and the evidence indicates DOTD did not have a legitimate nonretaliatory reason for terminating Ortego.  Ortego filed police complaints against Tate for her road rage/stalking.[273]  These were incidents of public concern in that the public desires that citizens alert the police of road rage to ensure public safety of the person confronted and others on the road when the road rage occurs.  Connie Standige, under the color of DOTD action, suspended and terminated Ortego and she was motivated to do so by Ortego's filing of the police complaints.  This is evident by the notices

---

[271] Ex. 24.

[272] Ex. 25;  Ex. FF; Ex. HH.

[273] Ex. FF.

stating that sent to Ortego when suspended and fired.[274]  Ortego had a property interest in her position as a civil service employee on permanent status at DOTD.[275] She suffered injury as a result of losing that property interest when she lost her job.

DOTD had a non-legitimate retaliatory reason for terminating Ortego when it fired her for filing police complaints against Tate.  DOTD's reason for suspending and firing her because Ortego created a hostile work environment due to her protected activity were not of sufficient concern to outstrip Ortego's First Amendment speech rights.[276]

Connie Standige acted with a reckless indifference to Ortego's federally protected rights given the years of harassment Tate did of Ortego and the lack of reprimands of Tate.[277]

89. Ortego does not subjectively feel she was terminated in retaliation for engaging in protected speech; rather, she feels that she was terminated in retaliation for complaining to DOTD about her disability.

Responding party's response:  Disputed.  Ortego in her transcript mentioned that she was retaliated against for voicing her concerns about safety and being in an unsafe place to Connie Standige.[278] This would include Tate's road rage/stalking incidents that occurred immediately after Ortego left the DOTD premises by fellow DOTD worker Tate.[279]

90. Standige, the decision maker, did not act unilaterally, and Ortego's termination was not motivated by speech; thus causation does not exist.

Responding party's response:  Disputed.  The pre-termination and termination letters are only signed by Connie Standige and indicate she

---

[274]  Ex. 25, Ex. FF; Ex. HH.

[275]  Ex. FF.

[276]  Ex. 25; Ex. FF; Ex. HH.

[277]  Ex. FF; Ex. HH; Ex. 24.

[278]  Ex. 5 at 202–3

[279]  Ex. 15.

acted alone.[280]  Given the extended period of harassment by Tate of Ortego and the numerous other incidents of harassment by Tate of others in the Business Office, Connie Standige acted with callous disregard for whether her actions violated the federally protected rights.[281]

91. The defendants are able to show legitimate, non-retaliatory reason for Ortego's termination.

    Responding party's response:  Disputed.  See response to  Fact #43.

92. Ortego was terminated in 2012 for legitimate non-retaliatory reasons. Ortego was terminated from her employment with DOTD for violation of PPM No. 29, Employee Conduct.

    Responding party's response:  Disputed.  See response to Fact #55.

93. Ortego was insubordinate in that she failed to provide police reports to supervisors as requested.

    Responding party's response:  Disputed.  See response to Fact #67.

94. Ortego also engaged in conduct unbecoming of a public employee when she disclosed confidential information developed through the course of an agency investigation that to other employees.

    Responding party's response:  Disputed.  See response to Fact #68.

95. DOTD management, Human Resources, and other departments were consulted prior to Ortego's dismissal and were involved in approving Ortego's termination.

    Responding party's response:  Disputed.  It is only clear that Connie Standige signed the suspension and termination letters indicating she

---

[280]  Ex. FF, HH.

[281]  Ex. 1; Ex. 5 at 88-91; Ex. 7 at para 41; Ex. 9; Ex. 11.

was involved and approved Ortego's termination.[282]

96. Nowhere in the record of these proceedings has Ortego denied violating the provisions of PPM No. 29 detailed in her termination notices.

>Responding party's response:  Disputed.  DOTD claimed that Ortego violated PPM No. 29 when she created a hostile work environment by her filing the EEOC complaint, the DOTD charges alleging harassment and retaliation by Tate, and filing police complaints against Tate"s road-rage/stalking incidents.[283] Ortego disputes this and contends that it was DOTD and Shelia Tate that created a hostile work environment and did so because she filed the EEOC complaint and for having asked for a reasonable accommodation.[284]

## PLAINTIFF'S STATEMENT OF PROPOSED FACTS

97.  Jodee Ortego was diagnosed with epilepsy in 2006 and has had epilepsy since.[285]

98.  Jodee Ortego suffered several seizures while working at DOTD between 2006 and her suspension in 2011.[286]

99.   Epilepsy is a disorder of the nervous system that can cause people to suddenly become unconscious and to have violent, uncontrolled movements of the body.[287]

100.  In its active state, epilepsy substantially limits major life activities of consciousness, standing, and walking.[288]

101.  In 2006, Jodee Ortego suffered a seizure at work at DOTD.  Within weeks, DOTD

---

[282]  Ex. 25; Ex. FF; Ex. HH.

[283]  Ex. FF; Ex. HH.

[284]  Ex. 5 at 121-122.

[285]  Ex. 5 at 30.

[286]  Ex. 5 at 58-60.

[287]  Merriam Webster dictionary; http://www.merriam-webster.com/dictionary/epilepsy

[288]  *Id.*

instructed Ortego that she could not drive vehicles for DOTD at work.[289]

102.  Jodee Ortego was employed at DOTD in the civil service and on permanent status at DOTD.[290]

103.  Jodee Ortego performed her duties at DOTD adequately and met or exceeded requirements of her job throughout her work life at DOTD.[291]

104.  Jodee Ortego filed charges against Shelia Tate including the following:  i)  EEOC charge;  ii) DOTD charge in 2009; iii )DOTD charge in 2010; iv) police charges in 2010 and 2011; and complained of reprimand by Tate regarding computer use.[292]

105.  DOTD suspended and fired Jodee Ortego for filing the above-named charges.[293]

106.  Shelia Tate sued Ortego accusing her of filing i)  EEOC charge;  ii) DOTD charge in 2009; iii )DOTD charge in 2010; and iv) police charges.[294]

107.  Jodee Ortego did not violate PPM No. 29 as described in the letter of pre-deprivation and dismissal because none of the above-named charges were false charges against Shelia Tate.[295]

108.  Any hostile work environment created at DOTD District 62 was caused by Shelia Tate.[296]

---

[289]  Ex. 5 at 62.

[290]  Ex. FF.

[291]  Ex. 4.

[292]  Ex. 1, 14, 15, 20, 22.

[293]  Ex. FF; Ex. HH; Ex. 25.

[294]  Ex. 7 at para. 41.

[295]  Ex. FF; Ex. HH.

[296]  Ex. 20.

Respectfully submitted,

BELL LAW FIRM, LLC

/s/ Paul F. Bell
Paul F. Bell (#30391)
4949 Tulane Drive
Baton Rouge, LA 70808
(225) 284-3235 888-812-7933 fax; bz9@cox.net
Attorney for Jo-Dee Ortego

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above has been served on all parties' counsel via the court's CM/ECF system at the time of this filing.

_/s/ Paul F. Bell_